MEADOR *v.* WEATHERS.

Opinion delivered January 19, 1925.

1. ADVERSE POSSESSION—EVIDENCE.—Evidence *held* insufficient to establish title by adverse possession.

2. ADVERSE POSSESSION—POSSESSION ACQUIRED UNDER LICENSE.—To establish title by adverse possession in one who acquired possession under license, he must have given notice that he was holding adversely or his possession must have been so notoriously hostile as to constitute notice.

3. REFORMATION OF INSTRUMENTS—EVIDENCE.—Evidence *held* insufficient to warrant reformation of description in deed.

4. REFORMATION OF INSTRUMENTS—EVIDENCE.—Though parol evidence is admissible in a suit to reform a deed for fraud or mistake, the evidence to warrant reformation must be clear, convincing and decisive.

5. PLEADING—AMENDMENT.—Refusal of a petition for leave to amend an answer so as to include a prayer for reformation of a deed was not an abuse of discretion where such leave was not sought until all the evidence had been taken and the case was ready for submission.

Appeal from Hot Spring Chancery Court; *J. P. Henderson,* Chancellor; affirmed.

STATEMENT OF FACTS.

Appellees brought this suit in equity against appellant to enjoin him from erecting a fence on the land described in their complaint and to quiet their title to said land. Appellant filed an answer in which he claimed title to the land in question by adverse possession.

William A. Trigg was the original source of title under which both parties claim. William A. Trigg conveyed said lands to Sabina C. Trigg, his wife. After his death, Sabina C. Trigg, by warranty deed in common form. executed on the 6th day of June, 1901, conveyed to E. E. Meador the following land lying in Hot Spring County Arkansas, to-wit: "Commencing 2.50 chains west of SE corner of SE¼ of NW½, section 33, township 6 S. and in range 19 W., and running west to Ouachita River, thence south 6.50 chains, thence east to center of Half Moon Lake, thence up the center of lake

to place of beginning, making in all twenty-one and 7½/100 acres of land, more or less; being a part of the north half of southwest quarter of section 33, township 6, range 19 west.''

After the warranty clause the deed contains the following: ''and I also agree that said Meador shall join the fence with me on the bank of the Half Moon Lake.'' The deed recites a consideration of $210.75 cash in hand paid by E. E. Meador.

W. A. Trigg died in 1888, and Sabina C. Trigg in 1916. Prior to her death Sabina C. Trigg conveyed by deed to her daughter, Mrs. Fannie Weathers, all of the land which she owned in section 33, township 6 south, range 19 west, in Hot Spring County, except 60 acres, which she reserved for the purpose of selling to her son, J. H. Trigg. The consideration recited in the deed was $1,370, which was paid by Mrs. Fannie Weathers. The deed contained a misdescription, and, for the purpose of correcting it, the children and heirs-at-law of Sabina C. Trigg, who had died interstate, executed a deed to said land under the correct description to Mrs. Fannie Weathers, on the 26th day of September, 1921. The other appellees claim title under Mrs. Fannie Weathers, and joined with her as plaintiffs in bringing this suit.

It appears that Half Moon Lake has to a great extent filled up, and that there are now about 50 acres of land north of it in the quarter-section above described. In July, 1921, C. D. Nelms, county surveyor of Hot Spring County, was employed by representatives of appellees to make a survey of the land described in the deed from Sabina C. Trigg to E. E. Meador. He took the description in the deed and made a survey and plat of the land, and the land covered by the description comprises about 20 acres. Soon after E. E. Meador obtained his deed from Sabina C. Trigg, he erected a fence from the fence on his land on the north side of Half Moon Lake in a southerly direction across said lake to the fence of Mrs. Sabina C. Trigg on the south side of said lake. By connecting his fence with her fence in this manner he

included a tract of land a part of which was in the lake, and used it for a hog pasture. The fence has been maintained ever since that time, and E. E. Meador has used said inclosure as a hog pasture.

According to the testimony introduced by appellees, this fence was erected under license given in the deed from Mrs. Sabina C. Trigg to E. E. Meador, and the use by him of the inclosure was permissive.

According to the testimony introduced by appellant, he occupied the land so inclosed adversely to all others, and has continued to so hold it since the execution of the deed to him by Sabina C. Trigg on the 6th day of June, 1901. Appellants also introduced testimony tending to show that Mrs. Sabina C. Trigg agreed to convey to him all of her land north of Half Moon Lake in said north half of the SW¼ of section 33, township 6 south, range 19 west, and by mistake only conveyed to him the 20½ acres described in said deed.

The testimony for appellees tends to show that the deed contained a correct description of all the land intended to be conveyed by Sabina C. Trigg to E. E. Meador. The testimony on both of these points will be set out and referred to more particularly under appropriate headings in the opinion.

After the evidence in the case had all been taken, appellant asked to amend his pleadings by praying for a reformation of his deed so as to correct the description therein and give him all of said land north of Half Moon Lake in said quarter section above referred to. The chancellor refused to allow him to amend his pleadings in this respect, and found the issues in favor of appellees. A decree was entered of record in accordance with the finding of the chancellor, and it was specifically decreed that the title to the land in dispute be quieted in appellees, and that appellant be restrained from building a fence on said land.

The case is here on appeal.

*D. D. Glover* and *D. M. Halbert*, for appellant.

*R. W. Huie, Jr.*, and *W. H. Mizell*, for appellees.

A deed cannot be contradicted by parol evidence, neither can one amend and ask for reformation after a submission of the case and the court has indicated what his findings will be. 158 Ark. 10, 249 S. W. 371. Parol evidence may be admitted, where the description is ambiguous, for the purpose of making it clear, but never to contradict a description. 30 Ark. 513. The deed here correctly describes the land conveyed, by metes and bounds, and defendant obtained title only to the land within the description. 95 Ark. 150. Where one enters into possession of land by permission from another, he is estopped from denying the title of that other. 84 Ark. 220; 102 Ark. 380; 98 Ark. 234. The status of permissive holding could not be changed except after notice to the real owner of adverse holding, or by overt acts indicating claim of ownership adverse to the owner. 133 Ark. 589.

HART, J., (after stating the facts). In the first answer filed by appellant, he claims title to the land in dispute by adverse possession. According to the testimony of J. H. Trigg, his mother, Sabina C. Trigg, sold to E. E. Meador about 20 acres of land and made him a deed to it under correct description. J. H. Trigg lived at Arkadelphia, Arkansas, at the time, and was looking after the farm which his mother owned near Half Moon Lake. He knew personally about the trade that was made between them and why it was made. He talked the matter over with both his mother and with E. E. Meador. He remembered why the provision was put in the deed about the fence. According to his testimony, E. E. Meador owned some land north of the land that he was buying from Mrs. Sabina C. Trigg. The latter had a fence which was built on the high ground on the south and east sides of Half Moon Lake, and the fence turned with the lake and ran up north to the north side of Mrs. Trigg's land on the east side of the lake. The fence was not built along the section line, but was built on the high ground

from Ouachita River so as to inclose the cultivated land of Mrs. Trigg on the south and east sides of Half Moon Lake. This left a strip of land of about 40 acres which was between the horn of Half Moon Lake and the river and above the south bank of the lake. The lake at this time was filled with water, and the south end of it went west and emptied into the river, as indicated on the plat made by the county surveyor. E. E. Meador wished to buy about 20 acres which adjoined his land on the north side of Half Moon Lake, and his mother agreed to sell it to him. This was a strip of land 6½ chains wide extending from Ouachita River to the center of Half Moon Lake on the east. In other words, it was a strip of land 6½ chains wide running south from the south boundary line of the lands already owned by E. E. Meador towards the northern boundary of Half Moon Lake. The northern boundary of the strip runs east and west 34.70 chains, and the southern boundary therefore was 28.50 chains in length. The southern boundary line of the strip extended from the Ouachita River in an easterly direction to the center of Half Moon Lake. Half Moon Lake extended from the Ouachita River in an easterly direction, and then turned north, so that both the southeastern and northeastern corners of the strip sold by Mrs. Trigg to Meador were in the center of Half Moon Lake. After Meador purchased said strip from Mrs. Trigg, he extended a fence from the southern boundary line of said strip across said Half Moon Lake and joined it with the fence of Mrs. Trigg on the south side of Half Moon Lake. This left a strip of ground inclosed in which he kept his hogs, and called it his hog pasture. According to his own testimony and that of his brother, he has held possession of this hog pasture since the execution of the deed to him by Mrs. Trigg in June, 1901. He had at all times claimed to own the hog pasture as his own. He admits, however, in his testimony, that at the time he purchased the land it was surveyed, and that he paid so much per acre for it. Under these circumstances it cannot be said that the chancellor erred in holding that

appellant had not acquired title to the hog pasture by adverse possession. In the first place, the deed from Mrs. Trigg to him gave him license to join his fence with that of Mrs. Trigg on the bank of Half Moon Lake. After the execution of the deed he built a fence from his own land across Half Moon Lake and joined it to the fence of Mrs. Trigg on the south side. This fence was built under the license given him in the deed, and his use of the strip of ground called the hog pasture was permissive. It is true that he testified that he held possession of the hog pasture adversely to all persons, and in this respect he is corroborated by the testimony of his brother.

On the other hand, as we have just seen, he is contradicted by the attending circumstances and by the testimony of J. H. Trigg. He admits himself that he bought the land at so much per acre, and the number of acres recited in his deed and the consideration recited therein corroborate the fact that he bought the land at so much per acre. The number of acres described in the deed is about 20½ acres and the consideration is $210.75. This would make a price of about $10 per acre.

Moreover, the possession of appellant having been acquired by the license given him in the deed, it devolves on him to show that he had given notice to Mrs. Trigg that he held the land adversely to her. There is nothing to show that he ever gave her any such notice, and his possession of the hog pasture, under the circumstances, was not sufficient to put Mrs. Trigg upon notice that he was claiming the land by adverse possession.

The construction of the fence which made the hog pasture, being permissive and being done under the license given Meador in the deed from Mrs. Trigg, in order to obtain title by adverse possession he must have given actual notice to Mrs. Trigg that he was claiming the land adversely, or his possession must have been in such a notoriously hostile way as necessarily to put the owner of the land upon notice. In other words, his actual use of the land must have been of such unequivocal

character as to reasonably indicate to the owner, visiting the premises during such statutory period, that such use and occupation indicated an appropriation of ownership in another. *Dowdle* v. *Wheeler,* 76 Ark. 529, and *Norwood* v. *Mayo,* 153 Ark. 620.

The case is entirely different from *Chicot Lumber Co.* v. *Dardell,* 84 Ark. 140. There a camp was erected upon the land, and, during the whole of the statutory period, the occupant was engaged with a large force of employees in cutting the timber and manufacturing it into staves. This was done openly, and the staves were hauled from the land to the railroad. These circumstances would clearly indicate to the owner that the occupant was holding the land adversely under claim of ownership.

In the case before us, as we have already seen, the erection of the fence was permissive, and the use of the woodland so inclosed was not sufficient to put the owner upon notice that Meador was claiming the land as his own.

It is next insisted that Meador was entitled to have his deed reformed so as to include, in any event, all of the land north of Half Moon Lake. We cannot agree with counsel in this contention. It is true that E. E. Meador testified that it was the intention of Mrs. Trigg to convey to him all of the land owned by her north of Half Moon Lake and that his testimony on this point is corroborated, to an extent, by that of three other witnesses. On this point Edward Orrell was asked if he did not know that, when E. E. Meador purchased this land from Mrs. Sabina C. Trigg, he bought all of the land north of the Half Moon Lake. His answer was, "Yes sir, it was the understanding." We quote from the testimony of J. A. Holmes the following: "Q. Did Mr. E. E. Meador purchase from her (Mrs. Trigg) all of her land north of Half Moon Lake in 1901? A. Yes sir."

On this point we quote from the testimony of William Hart as follows: "Q. Did Mr. J. H. Trigg or

Mrs. Sabina C. Trigg ever point out to you where the line was between Mr. Meador's land and the Trigg land? A. Mrs. Trigg has not, but Mr. Trigg has spoken concerning that. Q. Did you understand that the lake was the line between them? A. No, he pointed out a spring that it came close to. Q. That is, that it come across the lake at the lower end and joined to this fence and then run back and hit the center of the lake? A. Yes.''

In the first place, the evidence introduced by E. E. Meador to corroborate his own testimony on this point is very general and indefinite, and lacks that clear and unequivocal character which is necessary for a reformation of a deed. On the other hand, this testimony is flatly contradicted by J. H. Trigg and the attending circumstances. J. H. Trigg acted for his mother in the premises, and says that both Meador and his mother told him that it was the intention to embrace in the deed only the land that was described in it. He is corroborated in this respect by the description in the deed. A survey was made of the tract intended to be conveyed, and it was described in the deed by metes and bounds. This clearly indicates that there was an intention to convey only the land which had been surveyed and described in the deed. There would have been no use in measuring the land and giving a particular description of it by metes and bounds unless that description was to govern.

It is well settled in this State that, while parol evidence is admissible in an action to reform a deed on the ground of fraud and mistake, or either of fraud or mistake, the evidence to warrant such reformation must be clear, convincing, and decisive. *Welch* v. *Welch* 132 Ark. 227, and cases cited, and *Beneaux* v. *Sparks,* 144 Ark. 23.

Moreover, no reformation of the deed was asked until after all of the evidence had been taken and the case was ready to be submitted to the chancellor. The chancellor refused to allow the pleadings to be amended in this respect, and, under the circumstances, there was no abuse of discretion on his part.

It follows that the decree will be affirmed.